## NORTON v. UNITED GAS CORPORATION et al.

### No. 52.

District Court, W. D. Louisiana, Shreveport Division.

Feb. 7, 1940.

Swearingen & Miller, of San Antonio, Tex., and Spencer, Phelps, Dunbar & Marks, of New Orleans, La., for plaintiffs.

Wilkinson, Lewis, Wilkinson & Naff, of Shreveport, La., and Vinson, Elkins, Weems & Francis, Thos. Fletcher, Baker, Botts, Andrews & Wharton, and John Bullington, all of Houston, Tex., for defendants.

DAWKINS, District Judge.

Plaintiffs brought this suit for a declaratory judgment "declaring and decreeing the rights and obligations of the parties * * * in respect of * * *" certain agreements and contracts alleged to have been previously entered into. The terms of these contracts and agreements are set forth at length in some twenty articles in the petition, with attached exhibits, and the prayer contains thirteen separately numbered demands for specific relief, with the last further subdivided into paragraphs (a) to (f), inclusive.

In substance, the petition alleges that on or about September 3, 1930, a contract was made between plaintiff, Norton, individually, and a corporate subsidiary of the United Gas Company, a predecessor of one or more of the present defendants, with respect to certain mineral leases then owned by Norton in what has subsequently become the

Rodessa oil and gas field in the northwest corner of Louisiana, northeast corner of Texas and southwest corner of Arkansas.

Plaintiffs attached to their petition certain documents and exhibits numbered and identified as follows:

1. "Schedules A and B", being a list of leases covering some "4,500 acres in a block * * * together with the Commercial Gas well completed on one of said leases * * *";

2. "A schedule of leases upon which are situated the forty-four (44) natural gas wells, hereinafter referred to, which are being operated by defendants upon tracts which aggregate approximately 5,006 acres, situated on what is known as the gas cap * * *" in said field, marked "Exhibit 1";

3. A contract, dated September 3, 1930, between Norton and the Texas-Louisiana Production Corporation, (predecessor of some of the defendants) under which he "assigned and subleased * * * all his rights, title and interest and liability in, to and under the two oil and gas leases", described in "Schedule A", annexed to said contract, and also all of said rights and obligations under oil and gas leases, described in "Schedule B", likewise annexed to said contract, in so far only, however, as said leases described in said "Schedule B" cover the gas rights described as "Exhibit 2" in said petition.

4. An amendment of said contract of date, September 3, 1930 (Exhibit 2) under date of August 21, 1934, marked, "Exhibit 3";

5. A "supplemental agreement", dated May 14, 1936, between the plaintiffs and United Gas Public Service Company and United Production Corporation "ratifying, confirming and adopting said agreement of date September 3, 1930" and acknowledging that the first of these two companies had acquired "all the rights and liabilities of the Texas-Louisiana Production Corporation * * * in so far as the same covered and affected the mineral rights and leases on property situated in Caddo Parish, Louisiana and that the United Production Corporation had acquired * * *" all of the rights and obligations as to lands situated in Cass County, Texas, said document being annexed to the petition and referred to as "Exhibit 4".

Plaintiffs further alleged that on June 3, 1935, Norton and his wife had executed a deed of trust to himself, as trustee for the benefit of their minor son, Richard W. Norton, Jr., covering "all of the rights, title and interest in" the agreement of September 3, 1930 (Exhibit 2), in so far as concerned mineral rights in leases on certain lands situated in Cass County, Texas, and which is the interest represented by Norton, as trustee in the present suit.

The petition further alleged that in the contract of September 3, 1930, the "gas rights in all of said oil and gas leases" had been assigned in consideration of "payments * * * to be made out of gas produced therefrom, as hereinafter set forth." That subsequently, to September 3, 1930, plaintiffs had acquired additional oil and gas leases in the same vicinity, located in said Rodessa oil field, and the said defendants had also "acquired others in the same vicinity", and that defendants had "become the owners of the gas rights in all said additional oil and gas leases", subject to all of the terms of the said agreement of September 3, 1930, and the amendments thereto, and which covered "practically all of the oil and gas leases owned by defendants in the Rodessa field of Louisiana and Texas."

The petition then proceeds to recite at length the duties and obligations assumed by the defendants, both under the individual leases and the agreement of September 3, 1930, with subsequent amendments, such as, that they were required to reasonably develop the properties, protect them against drainage, etc; that the principal consideration for the agreements and assignments was the promise to produce gas upon which plaintiffs' royalties, etc., would bring in the "maximum revenues"; to use the gasoline extraction plant "to its fullest capacity" so as to reduce to a minimum the amount to be paid by plaintiffs as their part of said expense in the agreed division by which they would receive one-fourth (¼) of the net proceeds.

Plaintiffs also alleged numerous breaches of the said obligations by the defendants, in that they had failed to use due diligence in the development and to protect the said leases against drainage, but on the contrary had "actively participated in causing the drainage of natural gas" therefrom; and that they had failed to give notice to plaintiffs or to deliver oil produced from gas wells, as required by the contracts, or to account for casinghead gas produced from gas wells. Generally speak-

ing, the details recited in support of these charges include the statement that there are three producing sands in the Rodessa field, to-wit, the Hill, the least prolific, the Floyd or Caddo Levee Board sand and the Dees-Young sand, the latter being the most prolific and in the deepest horizon; that each of said sands in its particular horizon, consists of a "common reservoir" and production "from any well in either" drains the whole and affects every other well in the field which produces from anyone of the horizons. Further, that there had been completed on the "Norton leases" under the agreements affecting the same, forty-four (44) producing wells "situated on an aggregate of approximately 5,006 acres located on the structure of all three of said sands, thirty (30) of said wells being in Caddo Parish, Louisiana, and fourteen (14) in Cass County, Texas, and all of which were drilled and owned by the defendants"; that after drilling said wells, "and until the execution of the agreements on and subsequent to May 28, 1936, as hereinafter set forth" the defendants complied with their obligations and devoted all of their facilities to production from the "Norton leases", which had been "provided solely for such purpose and part of the construction thereof charged" against the amounts due to plaintiffs. That, subsequent to said date, "in total disregard" of their said obligations, defendants "entered into contracts for the purchase of gas from others", in the Rodessa field from leases in which "neither plaintiffs nor defendants had an interest * * *"; that the exact amount of gas so contracted for is unknown to plaintiffs, but well known to defendants, and from information received plaintiffs alleged that it amounts to "more than 40,000,000 cubic feet of gas per day"; that defendants were "actually purchasing more than 30,000,000 feet per day" thereof "and the daily amount of gas heretofore produced from the 'Norton leases' * * * has been and is now being reduced by the amount of said purchases". The petition then enumerates the dates of contracts, names of persons and prices being paid to said others for such gas.

It is further alleged that the forty-four (44) wells on the "Norton leases" have allocated to them 5,006 acres of land for producing purposes in the said three sands, whereas all of the other persons from whom defendants are buying gas have only 207 acres in the Rodessa field, but that, notwithstanding, the defendants "are now purchasing under said contracts * * * more than fifty percent (50%) of the entire amount of natural gas now being marketed by them" in said field from said other persons; that "about 8,000,000 feet per day" is being purchased from sixteen (16) wells on 2.64 acres of land in the town site of Rodessa, "immediately adjacent to the 'Norton leases' in said field" or at the rate of 3,000,000 feet per acre, as against 55,000 feet per acre, as from the "Norton leases". Plaintiffs next set forth a tabulation of monthly withdrawals in parallel columns from the "Norton" and "Other" leases for the period of from January to July, 1938, which it is stated are the only ones available for that year, showing a greater withdrawal from the "others" than from plaintiffs' wells, although plaintiffs' 5,006 acres constituted more than eighty percent (80%) of the area located on the "gas cap" in said field, while the "others" embraced less than five percent (5%) of said proven territory.

Further details as to excuses and reasons why the above course was pursued by the defendants, unnecessary to mention at this time, are given, but the net result is a serious charge of discrimination and favoritism in violation of the leases and agreements between plaintiffs and defendants. It is further charged that the defendants have participated in drainage of plaintiffs' leases by "plugging back" from the Dees-Young sand a large number of said wells, while continuing to produce from the wells on the adjoining lands of others out of that largest producing reservoir. Other charges are made at length of the failure to account for "high gravity oil produced from gas wells on the 'Norton leases'", casinghead gas, etc., also unnecessary to mention in details at this time.

Finally, as showing the existence of a real controversy, plaintiffs allege as follows:

"XIX. Defendants deny their obligations, as hereinabove alleged, and controversies have arisen between plaintiff and defendants embracing the matters hereinabove set forth, and it is necessary, in order to determine the rights of the parties, and to prevent unnecessary jeopardy of said leases and plaintiff's rights thereunder, that the rights and obligations of said parties in respect to said matters be in all things determined on the propositions and matters herein set forth, said determination will suffice to fix and establish the respective

rights of said parties which may be used as a basis for a proper accounting between the parties for past operations, and as a guide in accounting and operations under the terms of said contracts in the future, and to prevent further jeopardy of the rights and interests of plaintiff under the leases embraced in said agreements.

"XX. Plaintiff has protested verbally and in writing to said defendants, and made demands as to the matters herein set forth, and in accordance with the contentions herein made, and said demands have been denied by defendants, or plaintiff has received no satisfactory reply from said defendants, and proper written demand has been made on defendants prior to the filing of this suit in respect of the matters embraced herein."

The relief prayed in separately numbered paragraphs, stated in short form, is as follows:

1 and 2. Decreeing that the "defendants are responsible * * * for any past breaches and future performances" of the contracts, including the individual leases known as "Norton leases", in so far as they "covered the gas rights * * *" on the tracts designated in exhibits attached to plaintiffs' petition;

3. That it was the duty of defendants to use "due diligence" in developing said leases, marketing the gas therefrom, etc.;

4. That defendants are liable to plaintiffs "to the extent of one cent (1¢) per thousand (1,000) * * * on an amount of gas equal to the quantity purchased, or which may hereafter be purchased or marketed by defendants from wells belonging to third parties in said Rodessa field, subsequent to the date of the original agreement with plaintiff of September 3, 1930, unless and until the available gas from the leases covered by the agreements with plaintiffs has been first exhausted";

5. That defendants are obligated to "account to plaintiffs for twenty-five percent (25%) of the amount of the net proceeds of all natural gasoline that would or could have been obtained from natural gas" from the "Norton leases";

6. "* * * the liquid substance produced from gas wells which is not extracted from the gas, but can be separated from such gas by passing the same through an oil and gas separator, belongs to the owner of the oil rights" and defendants are bound to account therefor to plaintiffs;

7 and 8. That defendants should account to plaintiffs for the additional amount of either substance mentioned in the preceding numbered prayer, which could have been produced from gas wells which were plugged back from the Dees-Young sand. if this had not been done, and the failure to do this and to protect this sand from drainage constitutes a violation of the terms of the contract with plaintiffs;

9. That the defendants should account to plaintiffs for one cent (1¢) per thousand (1,000) on casinghead gas produced from oil wells on the "Norton lease";

10. That defendants are bound to use their entire plant and marketing facilities "at maximum capacity, with production exclusively from the 'Norton leases' so long as there is a sufficient amount thereof available for said purpose and thereafter to the extent it may be available";

11. That defendants are bound to comply with all the obligations of said agreement, including those of the individual leases, "in so far as they cover the gas rights" and to "save plaintiffs harmless from any loss or damages" flowing from the failure to do so;

12. That defendants have not "operated, produced or protected said 'Norton leases' * * * to the extent of their available facilities * * *"; and

13. That defendants are liable to plaintiffs:

(a) Because of drainage and failure to produce to the extent of one cent (1¢) per thousand (1,000) upon gas purchased from others in the Rodessa field since September 3, 1930;

(2) to the extent of twenty-five percent (25%) of the net proceeds for natural gasoline that could have been extracted from the gas thus purchased from others;

(b) To the extent of the increased value of production which would have resulted if Wells had not been plugged back from the Dees-Young sand;

(c) To the extent of the value of "high gravity oil" produced from gas wells on leases under which plaintiffs owned the oil rights;

(d) To the extent of the value at the well of casinghead gas at 14.04 pounds pressure;

(e and f) To the extent of any rights of plaintiffs that may be cancelled or lost because of defendants failure to comply with said agreements;

Certain preliminary motions and exceptions were filed, submitted and over-ruled. In conformity with the ruling of this court that any other and future motions should be included in the answer, defendants preliminarily have alleged that Magnolia Petroleum Company, a Texas corporation, (hereafter called Magnolia) and the Texarkla Corporation, created by the laws of Delaware, (hereafter called Texarkla), a citizen of the same state as defendants, are necessary and indispensable parties plaintiff to this suit. It is this issue of non-joinder which the court is now called upon to decide.

The matter has been submitted upon the admissions made in the answer to allegations of the petition, and upon a stipulation of facts between the plaintiffs and defendants, to which a large number of exhibits, including the contract of September 3, 1930, and amendments thereto, sample assignments by Norton, individually and as trustee to Magnolia and Texarkla, have been annexed.

From these admissions and stipulations, it appears that on July 9, 1936, Norton made an assignment to Magnolia of the oil rights (subject to a one-fourth (¼) over-riding royalty on said oil as to flowing wells) on twenty-three (23) leases, covering 3,669.05 acres in Caddo Parish, Louisiana, and Cass County, Texas; and on the same date, Norton, as trustee, for his said minor son, executed four (4) assignments to the Magnolia, covering the oil rights (subject to a similar one-fourth (¼) over-riding royalty upon flowing wells) embracing seven (7) leases on 2,001 acres of land in the Rodessa field of Cass County, Texas. All four assignments were similar, except as to "some of said acreage" the rights were restricted to and through the Young sand or formation.

On July 11, 1938, Norton, individually and as trustee, executed to Texarkla an assignment covering "mineral interests" as to sixty-five (65) oil, gas and mineral leases with certain exceptions specially stated in the assignment; and on July 23 of the same year, he, as an individual, made an assignment to the Texarkla covering the oil rights to two leases in so far as they covered 562 acres of land in the Caddo Parish section of the Rodessa field, and also the "one-fourth (¼) over-riding royalty reserved by the said Richard W. Norton in said assignment to the Magnolia Petroleum Company with respect to eight (8) leases in so far as said leases covered approximately 1,677 acres * * *". On the same date, he also assigned to the Texarkla the "oil rights only" in two leases "in so far as said leases covered approximately 107.05 acres" in the Cass County section of said field, and by the same instrument there was conveyed his one-fourth (¼) over-riding royalty in the "above assignments to the Magnolia Petroleum Company with respect to the eight leases in so far as they covered 1,278 acres" in the same county. At the same time, as trustee for his said son, he made assignments to the Texarkla of oil rights under three leases "to the extent of 530 acres" also in the same county, together with the one-fourth (¼) over-riding royalty, reserved in the assignments to Magnolia under three leases "in so far as they applied to 1,277 acres" in Cass County.

All of the assignments by Norton, both individually and as trustee, to the Magnolia and Texarkla contained similar provisions to the effect that "the parties take cognizance of the fact that the grantor (Norton) does not own the natural gas or casinghead gas rights", for the reason that the same had previously been conveyed to some of the present defendants or their predecessors in interest. However, several of these embraced the transfer of over-riding royalties, or the assignor's end of the leases to Magnolia and Texarkla, which were subject to the other general stipulations of the contract of September 3, 1930, and its amendments, including such as what should be done in the event the owners of the separate minerals, oil or gas, in conducting their operations, should discover minerals covered by the rights of the others.

It is urged by the defendants that, in determining the rights and obligations under these contracts and leases as demanded by the plaintiffs in this suit, the interests of the Magnolia and Texarkla will necessarily be affected; or at least the present defendants will be put in the position of being bound by such judgment as may be rendered herein, while those transferees, may, in the future, seek relief in some other court or jurisdiction as to similar rights and obligations under the same contracts with respect to other leases, and possibly have interpretations of a character different to and conflicting with that which will be made in the present case; and that such a result would compel defendants to

perform the same obligations in one way as to the present plaintiffs and in another as to the said transferees. On the other hand, plaintiffs point to the following contained in the stipulations of counsel as showing that those companies have no interest in the present controversy and can not be affected thereby: "The Texarkla Oil Corporation does not own and never has owned any interest of any kind or character whatsoever in any of the forty-four (44) wells described in Exhibit 1 attached to Plaintiffs' original petition in this suit. No producing well has ever been drilled on, and no oil, gas or other mineral produce has ever been obtained or produced from any of the tracts of land as to which the Texarkla Oil Corporation was assigned the gas and gasoline overriding royalties by the said R. W. Norton and R. W. Norton, Trustee, as set forth in Exhibits attached hereto, and hereinabove referred to, and no payments of any kind have ever been made or have accrued to the said Texarkla Oil Corporation on account of the gas and gasoline overriding royalties now or heretofore owned by it. Of the total of approximately 18,000 acres in which Texarkla Oil Corporation acquired said gas and gasoline overriding royalties, 186.6 acres were released and surrendered prior to the filing of the original petition in this suit, approximately 8200 acres have been released and surrendered since the filing of the original petition in this suit, and the Union Producing Company has notified said Texarkla Oil Corporation that it does not intend to pay the rentals which will fall due prior to January 27, 1940, on approximately 5600 acres. The Texarkla Oil Corporation, joined by the Union Producing Company, executed releases to said released acreage in each case on forms of Union Producing Company substantially as shown by a true copy of one of such releases attached hereto as Exhibit I–1, and said Union Producing Company, joined by the Texarkla Oil Corporation, executed to the Magnolia Petroleum Company an assignment of all their natural and casinghead gas rights in the C. W. Thacker lease, a true copy of which assignment is attached hereto as Exhibit I–2."

If Norton had made separate assignments of each individual lease to defendants, retaining the same royalties and oil rights in each, to the extent which he did in the contract of September 3, 1930, and later amendments, it would seem that he could have brought suit for the protection of his rights so reserved, as to anyone of said leases, without the necessity of including the others. Do the circumstances of his having assigned the natural gas and casinghead gas royalties in all of the leases, to defendants, in one contract with subsequent amendments, containing special provisions of the character now asked to be interpreted, and the additional fact that he thereafter assigned to Magnolia and Texarkla some of the rights so reserved and so retained as to some of those leases and lands not involved in this litigation, make it indispensable that these companies should be parties to this suit? Had there been separate assignments of rights under the several leases, as above suggested, without conveyance to other persons of any part of the royalties so reserved, a determination of issues between Norton and the present defendants of similar provisions in a suit upon a single lease and assignment would be some indication of what might be expected as to the others, but it would not be res judicata or conclusive as to them. Nor do I believe it could have been successfully contended, in those circumstances, that all of these other leases and the parties thereto, including the landowner or lessor, were indispensable or even necessary parties. Undoubtedly, Norton, as the lessee, in all those separate leases, could do as he saw fit with respect to the seven-eighths (7/8ths) working interest, so long as provisions for payment of rentals, royalties, etc., were unaffected and not breached.

In the first place, there is no controversy, nor has there been any development or production, according to the stipulations, upon any of the lands under those leases in which some of the rights of plaintiffs were assigned to these other companies, and there may never be such. An interpretation and adjudication of the contract and its amendments, as well as of the individual leases involved in these proceedings between plaintiffs and defendants would be only academic or advisory, in so far as those other companies were concerned. In fact, many of such leases have been formerly released by instruments executed by plaintiffs, defendants, the Magnolia and Texarkla. Must these last-mentioned companies be made parties because, perchance, a controversy may arise at some future date between them and the present defendants with respect to provisions of con-

tracts now sought to be interpreted, affecting lands and rights not within the scope of the present litigation? I think not. Such future action might involve matters not even thought of at the present time, based upon unrelated facts and acts as to which a decision of issues now raised would have no bearing or effect. Whether plaintiffs shall ultimately recover for the breaches alleged in this suit is of no concern to the companies sought to be brought in. In the case of Edenborn v. Wigton, 5 Cir., 74 F.2d 374, 376, the appellees were two of four alleged heirs who had agreed to settle their claims in the estate of a deceased relative by a single general instrument, and more than three years later, were paid the agreed sums and executed separate receipts therefor pursuant to the original agreement. In that case, Wigton et al. sought to set aside the settlements on the ground of fraud and error. Having the rights to invoke the jurisdiction of a federal court because of their citizenship, the suit was instituted in this court to revoke. In disposing of the contention that the other two heirs, who were citizens of the same state (Louisiana) with defendant, and had brought identical suits in the state court for Caddo Parish, were indispensable parties, the Court of Appeals for this circuit had this to say: "It is apparent that plaintiffs and their brother and sister have the same interest and are pressing the same claims, and that, if brought into the suit, they would have to be aligned on the same side. Thomas v. Anderson [8 Cir.], 223 F. 41, 42. This would oust the jurisdiction, as it appears, not from plaintiffs' petitions, but from the record, that the other two are citizens of Louisiana and have already filed suits in the state court. While it has long been the rule that equity will not proceed to a final decision where there are parties absent who are indispensable parties to the issues, Shields v. Barrow, 17 How. [130], 58 U.S. 130, 15 L.Ed. 158; Niles-Bement-Pond Co. v. Iron Moulders' Union, 254 U.S. 77, 41 S.Ct. 39, 65 L.Ed. 145; Ribon v. Chicago, R. I. & P. R. Co., 16 Wall. [446], 83 U.S. 446, 21 L.Ed. 367, it has also in the federal court been the rule from the earliest times, that, where the joinder of parties will oust the jurisdiction, the court will so frame its decree, if possible, as to give relief in the cause without affecting the rights of the absent parties, Payne v. Hook, 7 Wall. [425], 74 U.S. 425, 19 L.Ed. 260; Williams v. Crabb [7 Cir.], 117 F. 193, 59 L.R.A. 425; Mathis v. Hemingway [8 Cir.], 24 F.(2d) 951; West v. Randall, 2 Mason 181, Fed.Cas. No. 17,-424; Equity Rule 39 (28 U.S.C.A. [following] § 723); Thomas v. Anderson [8 Cir.], 223 F. 41; Rose v. Saunders, [9 Cir.], 69 F.(2d) 339, 342. The reason for this is that parties having a clear right to invoke the constitutional jurisdiction of the federal court ought not to, and will not, be deprived of that right on considerations merely of convenience; that is, where the jurisdiction may be exercised without injustice to the absent parties. Of course, if no such decree can be entered, jurisdiction will be declined. Roos v. Texas Co. [2 Cir.], 23 F. (2d) 171, 172; Vincent Oil Co. v. Gulf Refining Co. of Louisiana [5 Cir.], 195 F. 434. An examination of the pleadings and of the proofs taken on the hearing which resulted in the interlocutory orders complained of shows that each of the brothers and sisters makes the same claim as to the basis of their rights, each asserts the same interest, each seeks to charge appellant as trustee, each claims a part of the properties described in the suit, each claims fraud and overreaching. But for the fact that to make them parties would oust the jurisdiction of the federal court, we think the court should, and no doubt would, before proceeding in the cause, have required the other brother and sister to be brought in, so that in one decree in one suit the rights and interests of all the parties could have been settled and vindicated. Since he did not do this because it could not have been done without depriving each of the plaintiffs of his undoubted right to invoke the constitutional jurisdiction of the court, it remains only to consider whether plaintiffs' bills should now be dismissed for want of parties, or may be retained for part or all of the relief prayed, and whether there was an abuse of discretion in issuing the interlocutory injunction as to all of the properties and in taking all of them in charge."

See, also, United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; Bourdieu v. Pacific Western Oil Company, 299 U.S. 65, 57 S.Ct. 51, 81 L.Ed. 42; Waterman v. Canal-Louisiana Bank, 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80.

There would appear to be no difference in the law with respect to indispensable parties, where, instead of a present demand for money or specific property, the comparatively recent Declaratory Judgment Act is invoked. That law (section

274d of the Judicial Code, Tit. 28, § 400, U.S.C., 28 U.S.C.A. § 400) provides that "in cases of actual controversy * * * the courts * * * shall have power * * * to declare rights and other legal relations of any interested party petitioning for such declaration * * *." Of course, indispensable parties must be before the court in either type of case, that is, whether relief is sought under a present demand or in declaration of rights, but unlike the Uniform Declaratory Judgment Act adopted by some of the states, parties are not required to be included merely because they have an interest in the subject matter of the litigation. See Western Casualty & Surety Company v. Beverforden, 8 Cir., 93 F.2d 166.

 Rule 19 of the New Rules of Federal Procedure, 28 U.S.C.A. following section 723c, provides, in part, as follows:

"(a) Necessary Joinder. Subject to the provisions of Rule 23 [class suits] and of subdivision (b) of this rule, persons having a joint interest shall be made parties and be joined on the same side as plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so, he may be made a defendant or, in proper cases, an involuntary plaintiff.

"(b) Effect of Failure to Join. When persons who are not indispensable, but who ought to be parties if complete relief is to be accorded between those already parties, have not been made parties and are subject to the jurisdiction of the parties before it, the court shall order them summoned to appear in the action. The court in its discretion may proceed in the action without making such persons parties, if its jurisdiction over them as to either service of process or venue can be acquired only by their consent or voluntary appearance or if, though they are subject to its jurisdiction, their joinder would deprive the court of jurisdiction of the parties before it; but the judgment rendered therein does not affect the rights or liabilities of absent persons."

After due consideration of the allegations, stipulations, exhibits, etc., together with the nature and entire circumstances, submitted upon the hearing of the motion, it does not appear to me that any injustice or injury will be done the interests of either the defendants or the persons sought to be made parties; and, since, admittedly, to bring the latter in would deprive the plaintiffs of the constitutional right to have their contentions determined in a federal court, to the extent discretion exists in the court, I think it my duty to decide the matter in a way to preserve that jurisdiction.

The motion to make parties should therefore be denied.

Proper decree should be presented.